IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CV-903-FL

THOMAS ERDMAN,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )               ORDER
                                        )
FLEETCOR TECHNOLOGIES, INC.,            )
                                        )
                Defendant.              )

        This matter comes before the court on defendant's motions for summary judgment (DE 49),

and to exclude the expert testimony of Brian Foley (DE 61), together with plaintiff's motion to

amend his complaint (DE 78). The motions have been fully briefed by the parties. In this posture,

the issues raised are ripe for ruling. For the reasons that follow, defendant's motion for summary

judgment is granted, defendant's motion to exclude the expert testimony of Brian Foley is denied

as moot, and plaintiff's motion to amend is denied.

## STATEMENT OF THE CASE

        Plaintiff initiated this action against his former employer on November 16, 2016, alleging

breach of contract, violation of the North Carolina Unfair and Deceptive Trade Practices Act

("UDTPA"), N.C. Gen. Stat. § 75.1-1 et seq., fraud, breach of fiduciary duty, and violation of the

North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1 et seq.. Defendant had

purchased the business enterprise unit of plaintiff's original employer, Telenav, Inc. ("Telenav"),

in which plaintiff worked ("Telenav Enterprises"). Plaintiff seeks damages and lost benefits arising

from defendant's alleged breach of an offer setting out plaintiff's employment terms. Defendant denies any liability.

The case proceeded through discovery largely without incident, subject to four agreed upon time extensions, and a consent protective order. The single contested issue in discovery, raised by defendant, concerned conduct of the deposition of Ronald Clarke ("Clarke"), defendant's chief executive officer ("CEO"). Clarke was allowed to be deposed under conditions set by the court.

Following discovery, defendant filed the instant motion for summary judgment, seeking judgment in its favor on all of plaintiff's claims. Defendant relies upon testimony of current and former employees, including Clarke; Crystal Williams ("Williams"), senior vice-president of human resources; Jeff Lamb ("Lamb"), plaintiff's first supervisor who eventually left defendant's employ; and Paul Citarella ("Citarella"), plaintiff's second supervisor. Defendant also relies upon plaintiff's deposition testimony and written discovery responses.

In addition to documentary evidence, plaintiff relies in opposition upon much of the same testimony as defendant, together with the testimony of Alissa Vickery ("Vickery"), defendant's senior vice-president of accounting and controls, and John Young ("Young"), a Telenav Enterprises employee who agreed to work for defendant after the Telenav Enterprises acquisition. Additionally, plaintiff relies upon expert testimony of Brian Foley ("Foley"), which defendant seeks in separate motion now before the court to exclude on grounds that such testimony is neither reliable nor helpful as required by Federal Rule of Evidence 702.

Plaintiff also relies upon evidence discovered in another case removed to the United States District Court for the Northern District of California on November 8, 2016. The case was initiated

against defendant by other former Telenav Enterprises employees ("<u>Chen</u> case"). There, Naidong Chen ("Chen") and Kumar Manindra ("Manindra") raised claims similar to those presently before the court.[1] Like with plaintiff, Chen and Manindra alleged that defendant promised performance stock options and bonus compensation, but neither received the promised incentives following acquisition of Telenav Enterprises. Plaintiff relies in this case upon testimony taken in the <u>Chen</u> case from Williams, Lamb, Clarke, Chen, and Manindra.

On January 15, 2019, several weeks after the motions for summary judgment and to exclude Foley's testimony become ripe for decision, and long after the deadline had expired for any motion to amend the pleadings, plaintiff filed the instant motion to amend his complaint. Incorporating arguments and theories raised for the first time in plaintiff's response in opposition to defendant's motion for summary judgment, plaintiff seeks to allege the existence of a second stock option contract and breach thereof. Defendant protests this motion as untimely and prejudicial.

## STATEMENT OF THE UNDISPUTED FACTS

Around 2010, plaintiff was hired by Telenav to serve as vice-president of sales. (Erdman Dep. (DE 52-1) 27:22-23). Within several weeks he became responsible for marketing, product development, and customer support. (Erdman Dep. (DE 52-1) 27:23-28:1). During his employment with Telenav, plaintiff petitioned his employer to form a business unit called Telenav Enterprises to focus on mobile applications targeting business consumers. (Erdman Dep. (DE 52-1) 28:5-13, 28:22-29:1). Plaintiff supervised 70 to 85 people. (Erdman Dep. (DE 52-1) 35:9-12).

Defendant, through Lamb, hired Telenav Enterprises to build a mobile application. (Erdman

---

[1] Like plaintiff, defendant promised Chen and Manindra performance stock options and bonus compensation in their employment offer letters, but neither received the promised incentives following acquisition of Telenav Enterprises.

Dep. (DE 52-1) 36:10-22). During this time, plaintiff and Lamb had the opportunity to work closely together, and conversations between the two about the wealth Lamb had acquired working for defendant encouraged plaintiff to solicit the sale of Telenav Enterprises to defendant. (Erdman Dep. (DE 52-1) 35:17-37:1). Lamb related that defendant wanted to acquire Telenav Enterprises to grow defendant's telematics business and develop mobile applications. (Erdman Dep. (DE 52-1) 37:22-38:12, 40:20-22).

Plaintiff was the conduit between defendant and Telenav Enterprises in negotiating the deal overall, including compensation for employees hired to work at Telenav Enterprises post-acquisition. (Erdman Dep. (DE 52-1) 39:22-40:2). Plaintiff and Lamb decided which Telenav Enterprises employees should receive job offers, and together they extended offers or delivered severance notices. (Erdman Dep. (DE 52:1) 44:2-22). Plaintiff reviewed the offer letters defendant created in advance to make sure the salary was consistent with their Telenav Enterprises compensation. (Erdman Dep. (DE 52:1) 39:13-40:2).

Plaintiff was offered the position of senior vice-president of mobile solutions by offer letter dated March 11, 2013. (Erdman Dep. (DE 52-1) 51:9-12; see Offer Letter (DE 68-4) at 1). Defendant promised that plaintiff "will be eligible to earn up to 50% of [his] annualized base salary in a bonus." (Offer Letter (DE 68-4) at 1). Defendant also promised stock options, providing that plaintiff "will be awarded 15,000 of FleetCor Performance Stock Options. We will work together to establish the performance criteria over the next month. These options require board approval which we will seek as soon as administratively practical." (Offer Letter (DE 68-4) at 1). Plaintiff and Lamb were supposed to negotiate the performance criteria. (Erdman Dep. (DE 51-2) 71:11-18; Williams Dep. (DE 52-5) 37:4-12). Plaintiff did not negotiate any changes to the language of his

offer letter, executed on March 12, 2013.  (Erdman Dep. (DE 52-1) 54:1-17; Offer Letter (DE 68-4) at 2).

Within a month after executing his offer letter, plaintiff met with Lamb to consider more particularly performance goals for his bonus compensation and stock option.  (Erdman Dep. (DE 52-1) 71:19-72:12).  Plaintiff recalls Lamb represented that plaintiff's performance goals "were in good shape," and "if not formally approved they would be approved."  (Erdman Dep. (DE 52-1) 72:20-23).  Plaintiff's tentative stock option vesting criteria for his first year of employ focused on achieving 2013 budgeted earnings before interest, taxes, depreciation and amortization ("EBITDA").  (Erdman Dep. (DE 52-1) 73:9-13; <u>see</u> Williams Dep. (DE 52-5) 45:6-21, 60:2-23).  In July 2013, Lamb told plaintiff that his stock option criteria had not been approved.  (Lamb Dep. (DE 68-9) 81:13-22).

Defendant's stock option vesting decisions are governed by an Equity Compensation Plan ("Plan"), which vests defendant's compensation committee ("Committee") with total discretion to determine stock option grants, criteria, and vesting.  (Plan (DE 68-18) at 20-21).  Typically, Clarke makes recommendations about granting or vesting stock options to the Committee, and the Committee decides whether to approve, reject, or modify the recommendation.  (Clarke Dep. (DE 52-7) 21:6-18).  Although the Committee has the power to grant stock options or set vesting criteria on its own initiative, to Clarke's knowledge it has not been done without a recommendation first being put forward by him or Williams.  (Clarke Dep. (DE 52-7) 21:16-23, 23:2-18).  On April 25, 2013, the Committee granted plaintiff an option for 15,000 shares of defendant's stock.  (Committee (DE 68-17) at 1, 3; <u>see</u> Williams Dep. (DE 52-5) 43:5-15).  The option "[was] granted upon the standard grant terms set forth in the Company's forms of option grants under the [Plan], as modified

to include performance criteria . . . ." (Committee (DE 68-17) at 1). The Committee approved plaintiff's option grant without established vesting criteria in order to lock in the earliest and most beneficial stock price for plaintiff. (Clarke Dep. (DE 52-7) 29:17-21; 35:18-36-7).

Ultimately, the Telenav mobile application development efforts were unsuccessful in Clarke's view due to poor reception by consumer end users. (Clarke Dep. (DE 52-7) 49:2-6, 51:2-4, 67:17-68:13). As a result, Clarke did not propose performance criteria to the Committee. (See Clarke Dep. (DE 52-7) 38:1-22, 49:2-18, 98:11-23). However, in spring 2014, the Committee approved a recommendation by Clarke to vest plaintiff in 25% of the shares covered by option grant due to the achievement of plaintiff's tentative performance criteria for 2013. (Lamb Dep. (DE 52-6) 66:6-21; Williams Dep. (DE 52-5) 45:9-17, 61:2-62:3).

In April 2014, Lamb reached out to plaintiff and told him that he was unable to secure approval for 50% vesting, as he had hoped, because Clarke only supported 25% vesting. (Erdman Dep. (DE 52-2) 107:20-108:19; see Lamb Dep. (DE 52-6) 106:4-24). Plaintiff objected to this, but Lamb said "Ron makes the decisions" and "that's how it works." (Erdman Dep. (DE 52-2) 108:7-10). Following subsequent conversations with Lamb in May 2014, plaintiff made several attempts to reach out to Williams in order to determine his performance criteria for his stock option. (See, e.g., Erdman Dep. (DE 52-2) 110:23-111:15; 2/24/15 Email (DE 68-5) at 3). During these conversations, plaintiff sought information on his performance vesting criteria, and he suggested to Williams that Telenav Enterprises employees have their stock incentives converted to time based options. (2/24/15 Email (DE 68-5) at 3).

Plaintiff obtained a bonus each year he worked for defendant. (Erdman Dep. (DE 52-3) 154:13-19, 166:1-11, 169:16-18). He worked for defendant until his position was terminated on

April 12, 2016.  (Termination Letter (DE 68-16) at 1).  Plaintiff received an option certificate for 3,750 shares with his termination letter.  (Termination Letter (DE 68-16) at 3).

Additional facts pertinent to the instant motions will be discussed below.

## DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Plaintiff's Motion for Summary Judgment (DE 49)

1.      Breach of Contract

Plaintiff asserts defendant breached the terms of their employment agreement, did not honor its vesting commitments for 2013, and failed to to pay plaintiff a bonus. (See Compl. ¶ 76). Plaintiff also alleges breach of an oral contract between him and Lamb setting vesting criteria for his option. (See Compl. ¶¶ 81-82).

Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). A contract, express or implied, requires assent, mutuality, and definite terms. See Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961).

When a party affixes his signature to a contract, he manifests his assent to the contract.  See Branch Banking & Tr. Co. v. Creasy, 301 N.C. 44, 53 (1980). "Mutuality of promises means that promises, to be enforceable, must each impose a legal liability upon the promisor. Each promise then becomes a consideration for the other."  Wellington-Sears & Co. v. Dize Awning & Tent Co., 196 N.C. 748, 751 (1929).  "[A] contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations."  Boyce v. McMahan, 285 N.C. 730, 734 (1974);  Thompson-McLean, Inc. v. Campbell, 261 N.C. 310, 314 (1964) (internal citations omitted). "To be binding, the terms of a contract must be definite and certain or capable of being made so."  Horton, 255 N.C. at 679 (quoting Williamson v. Miller, 231 N.C. 722, 728 (1950)).

In North Carolina, the statute of limitations period for bringing claims for breach of contract and violation of the covenant of good faith and fair dealing is three years.  N.C. Gen. Stat. § 1-52(1); Ussery v. Branch Banking & Tr. Co., 368 N.C. 325, 333 n.5 (2015).  The statute of limitations runs from when the breach occurs.  See Ussery, 368 N.C. at 327, 335.

On March 11, 2013, defendant extended an offer of employment to plaintiff based on the general terms and conditions set forth in its offer letter.  (Offer Letter (DE 68-14) at 1).  Plaintiff executed the offer letter on March 12, 2013, manifesting his assent to the terms contained therein. (Offer Letter (DE 68-14) at 2).  Moreover, the letter reveals mutuality of obligation, because plaintiff agreed to work for defendant as "SVP Mobile Solutions" reporting to Lamb, and in exchange defendant would provide him with compensation consistent with the terms of the letter.  (Offer Letter (DE 68-14) at 1-2).  The letter also provides general terms and conditions of employment. (Offer Letter (DE 68-14) at 1-2).  Therefore, plaintiff's executed offer letter constitutes a contract

outlining the terms of his employment-at-will arrangement with defendant. However, defendant is nonetheless entitled to judgment as a matter of law.

Turning first to plaintiff's bonus compensation, the terms of the offer letter simply state "[y]ou will be eligible to earn up to 50% of your annualized base salary as a bonus." (Offer Letter (DE 68-4) at 1). Defendant did not breach any purported obligation to provide a bonus: plaintiff earned a bonus for each full year that he worked for defendant. (See Erdman Dep. (DE 52-3) 154:13-19, 166:1-11, 169:16-18).

Plaintiff's stock option claim is equally problematic because it is time barred. Plaintiff's executed offer letter states that defendant would work with him to establish performance criteria "over the next month." (Offer Letter (DE 68-4) at 1). If any breach did occur, it occurred one month from the date the contract was accepted, which occurred on March 12, 2013. (Offer Letter (DE 68-4) at 2). Plaintiff became aware of this failure no later than July 2013. (Lamb Dep. (DE 68-9) 81:13-22). Plaintiff filed this action on November 16, 2016, well after the statute of limitations had run for his breach of contract claim.

Plaintiff attempts to save his breach of contract claim by invoking the implied covenant of good faith and fair dealing. (See Resp. Opp. (DE 73) at 21-22). "There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). However, plaintiff's claim is "part and parcel" of his breach of contract claim. Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000). Such a claim is also time-barred because plaintiff knew no later than July 2013 defendant failed to establish performance criteria within a month after accepting his offer. See Ussery, 368 N.C. at 327, 335; (Lamb Dep. (DE 68-9) 81:13-

22).  Plaintiff did not file a lawsuit within three years of the covenant, which by the terms of the contract required performance criteria to be established within a month after acceptance of the offer.  Consequently, plaintiff's invocation of the covenant of good faith and fair dealing falls flat.

Finally, plaintiff claims defendant breached an oral contract made between him and Lamb that 50% of the shares in plaintiff's option grant would vest based on achieving the 2013 performance criteria.   "A principal is liable upon a contract duly made by his agent with a third person (1) when the agent acts within the scope of his actual authority; (2) when the contract, although unauthorized, has been ratified; (3) when the agent acts within the scope of his apparent authority, unless the third person has notice that the agent is exceeding his actual authority."  Inv. Properties of Asheville, Inc. v. Allen, 283 N.C. 277, 285–86 (1973) (internal citations omitted). "One dealing with an agent or representative with known limited authority can acquire no rights against the principal when the agent or representative acts beyond his authority or exceeds the apparent scope thereof."  Id. at 286.

Assuming without deciding that an oral contract did exist between Lamb and plaintiff regarding the performance vesting criteria, such a contract is not enforceable against defendant as Lamb's principal.  Under defendant's Plan, the only entity with actual authority to approve vesting criteria on behalf of defendant is the Committee.  (See Plan (DE 68-18) at 18, 20-21).  Therefore, Lamb did not have actual authority to approve vesting criteria on behalf of defendant.

Additionally, Lamb did not have apparent authority to approve the vesting criteria.  Plaintiff had notice, both through his offer letter and in conversation, that Lamb did not have the authority to approve the vesting criteria for the performance stock option under discussion, and that approval of performance vesting criteria was required from somebody other than Lamb.  (See Offer Letter

(DE 68-4) at 1 (stating board approval was required for the options); Erdman Dep. (DE 52-1) 72:6-23 (describing Lamb's conversations with Williams regarding obtaining approval for the options)). Accordingly, plaintiff had notice that Lamb was exceeding his authority to make any purported contractual promise regarding the vesting criteria. See Inv. Properties of Asheville, 283 N.C. at 286.

Defendant only ratified Lamb's actions by vesting 25% of plaintiff's stock under the option grant based on the 2013 proposed performance criteria. (See Erdman Dep. (DE 52-1) 73:21-25; Lamb Dep. (DE 68-9) 61:5-25; Clarke Dep. (DE 68-22) 48:1-6, 56:3-13, 100:3-18). However, plaintiff received those vested shares. (Termination Letter (DE 68-16) at 3). Therefore, plaintiff has no cause of action for breach of oral contract against defendant based on conversations between him and Lamb.

The court grants defendant's motion for summary judgment on plaintiff's breach of contract and oral contract claims.

### 2. Fraud

Plaintiff alleges that defendant committed fraud by inducing plaintiff to accept defendant's offer of employment then concealing that it did not approve performance criteria or allow plaintiff to fully vest in his stock. (Compl. ¶¶ 96-106).

### a. Defendant's Pre-Acquisition Representations

The essential elements of fraud are "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injur[ed] party." Ragsdale v. Kennedy, 286 N.C. 130, 138 (1974). "Additionally, any reliance on the allegedly false representations must be reasonable." Forbis v. Neal, 361 N.C. 519, 527 (2007) (internal citation omitted). "Whether each of the elements

of actual fraud and reasonable reliance are met are ordinarily questions for the jury unless the facts are so clear that they support only one conclusion." Head v. Gould Killian CPA Grp., P.A., 371 N.C. 2, 9 (2018) (internal citation omitted).

Turning first to defendant's pre-acquisition conduct, plaintiff has failed to show that defendant made a factual misrepresentation. See Ragsdale, 286 N.C. at 139 ("A subsisting or ascertainable fact[], as distinguished from a matter of opinion or representation relating to future prospects, must be misrepresented."). Lamb shared with plaintiff how much money he had made with his own stock options, but the parties do not dispute the veracity of this statement. (See Erdman Dep. (DE 52-1) 37:9-19; Lamb Dep. (DE 52-6) 177:6-178:2). Lamb presented plaintiff with an illustration indicating what defendant's stock could be worth to plaintiff. (Erdman Dep. (DE 52-1) 45:5-22; Stock Option Illustration (DE 68-11)). However, in this instance, a representation relating to plaintiff's future prospects is not a false statement, because Lamb did not have peculiar knowledge of the stock's future value or the business outcomes resulting from the Telenav acquisition. See Ragsdale, 286 N.C. at 139; (Lamb Dep. (DE 52-6) 175:1-18). Defendant also made clear that it had not yet developed performance criteria in its offer letter. (See Offer Letter (DE 68-4) at 1-2). Consequently, defendant never made any false representation or omission to induce plaintiff to enter an employment relationship with defendant.

Plaintiff contends that none of the Telenav key employees would have agreed to an employment arrangement with defendant if they knew they would not receive vested stock options. (Resp. Opp. (DE 73) at 25). Even so, Lamb's pre-acquisition representations regarding the potential value of the stock options were not false statements. Plaintiff also makes no argument that Lamb omitted some material fact known to him at the time the deal with Telenav was arranged, and can

point to no evidence that Lamb intentionally deceived plaintiff.

b.    Defendant's Post-Acquisition Conduct

"North Carolina's economic loss rule provides that 'ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor.'" Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quoting N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (1978) ). Under this rule, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. (quotations omitted). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Id. (quotations omitted). "Accordingly, North Carolina law requires' courts to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." Id. (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) (dismissing plaintiff's fraud claim under the economic loss rule)). "Only where a breach of contract also constitutes an 'independent tort' may tort actions be pursued." Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 330 (4th Cir. 1994).

Furthermore, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Id.; see N. Carolina State Ports Auth., 294 N.C. at 83 ("[O]ur research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill.").

Plaintiff's fraud claims regarding defendant's post-acquisition conduct are barred by the

economic loss rule because they are not distinct from breach of contract, they arise in the course of the parties' employment relationship, and are properly resolved under the law of contract. Plaintiff argues that defendant concealed material facts, including

> (1) that the decisions or what issues went to the Compensation Committee were solely in the discretion of Clarke; (2) that Erdman's stock was unlikely to ever vest because Clarke did not believe that the enterprise business unit was profitable; (3) that Lamb told him that vesting criteria would be established and sent to the Compensation Committee for approval; (4) that the criteria for the 2013-14 year were never sent to or approved by the Compensation Committee; [and (5)] that Lamb's promises regarding the vesting of Plaintiff's stock were not approved by the Compensation Committee.

(Resp. Opp. (DE 73) at 23). These contentions are all rooted in whether defendant complied with its alleged contractual obligation to set performance criteria for plaintiff based on the implied covenant of good faith and fair dealing in the employment agreement. (See Resp. Opp. (DE 73) at 19-20). Consequently, plaintiff's fraud claim fails as a matter of law.

### 3. Unfair and Deceptive Trade Practices

Plaintiff alleges defendant violated the UDTPA "by inducing [plaintiff] to accept employment through false, deceptive, or misleading statements, assertions, averments, promises or other communications . . . ." (Compl. ¶ 92).

In North Carolina, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). "In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656 (2001). The term "commerce" is defined in the UDTPA as "all business

activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b).

"Although this statutory definition of commerce is expansive, the Act is not intended to apply to all wrongs in a business setting. For instance, it does not cover employer-employee relations." HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 593 (1991). But see Sara Lee Corp. v. Carter, 351 N.C. 27, 34 (1999) (finding employee status would not protect a defendant where defendant also engaged the company in a buyer-seller relationship). The UDTPA "is not focused on the internal conduct of individuals within a single market participant, that is, within a single business." White v. Thompson, 364 N.C. 47, 53 (2010).

Here, plaintiff claims defendant withheld benefits promised to him as compensation for serving as an employee, specifically his performance stock option and bonus compensation. (See Offer Letter (DE 68-4); Termination Letter (DE 68-16). Withholding these benefits does not have an impact beyond the employer employee relationship, and thus is not "in or affecting commerce." See, e.g., Haynes v. B & B Realty Group, LLC, 179 N.C. App. 104, 112 (2006) (denying plaintiff's purported rights under profit sharing agreement not in or affecting commerce); Durling v. King, 146 N.C. App. 483, 489 (2001) (holding defendant's actions in withholding commissions from plaintiff does not violate the UDTPA).

In an effort to recast his UDTPA claim, plaintiff argues that the denial of his employment benefits was in or affecting commerce because the sale of Telenav Enterprises "would not go through without buy-in from all key employees." (Resp. Opp. (DE 73) at 27). Even applying plaintiff's logic, the only aggrieved "consumer" possibly protected by the UDTPA is Telenav, the company that sold Telenav Enterprises to defendant. See Sara Lee Corp., 351 N.C. at 32-33 ("In

this case, defendant and plaintiff clearly engaged in buyer-seller relations in a business setting, and thus, we hold that defendant's fraudulent actions fall within the ambit of the statutory prohibition of unfair and deceptive acts or practices as determined by the trial court."). Plaintiff has not alleged that he is bringing this action as the party selling Telenav Enterprises to defendant, and the record does not disclose such a relationship. Therefore, plaintiff is not a "consumer" intended to be protected by the UDTPA, and his claim fails as a matter of law.

### 4. Breach of Fiduciary Duty

Plaintiff alleges that defendant breached a fiduciary duty by failing to establish performance criteria for his performance based stock option grant. (Compl. ¶¶ 107-13).

A claim of breach of fiduciary duty requires "(1) a showing of a fiduciary relationship, (2) thereby establishing a fiduciary duty, and (3) a breach of that duty." Dalton v. Camp, 353 N.C. 647, 654 (2001). "[A] fiduciary relationship is generally described as arising when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Dallaire v. Bank of Am., N.A., 367 N.C. 363, 367 (2014) (internal quotations omitted). "Fiduciary relationships are characterized by "confidence reposed on one side, and resulting domination and influence on the other." Id. "Under the general rule, the relation of employer and employee is not one of those regarded as confidential." Dalton, 353 N.C. at 651.

Plaintiff has not pleaded any facts or proffered any evidence showing that he reposed special confidence in defendant to vest his stock under the option grant. Employer-employee relationships are generally not considered fiduciary relationships, and plaintiff has not shown any special confidence meriting an exception to this rule. (See Erdman Dep. (DE 52-1) 51:9-20). Therefore,

the court grants defendant's motion for summary judgment on plaintiff's breach of fiduciary duty claim.

     5.      North Carolina Wage and Hour Act

Plaintiff seeks recovery under the NCWHA for allegedly not paying wages due to him. (See Compl. ¶¶ 114-21). Under the NCWHA, "'[w]age' paid to an employee means compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation." N.C. Gen. Stat. § 95-25.2(16). A "'wage' includes includes sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments." Id. § 95-25.2(16). "[G]iving the statutory language its natural and ordinary meaning, the Wage and Hour Act requires an employer . . . to pay those wages and benefits due when the employee has actually performed the work required to earn them." Kornegay v. Aspen Asset Grp., LLC, 204 N.C. App. 213, 229 (2010) (emphasis in original) (internal citations omitted).

Defendant never approved any performance criteria for plaintiff's option grant, aside from the 25% of his shares under the option grant that were vested in spring of 2014. (Erdman Dep. (DE 52-1) 73:21-25; Lamb Dep. (DE 68-9) 61:5-25; Clarke Dep. (DE 68-22) 48:1-6, 56:3-13, 100:3-18). The option was given to plaintiff in an option certificate upon his termination. (Termination Letter (DE 68-16) at 3). The remaining 75% of plaintiff's stock option grant is not a "wage" within the meaning of the NCWHA. See N.C. Gen. Stat. § 95-25.2(16); Kornegay, 204 N.C. App. at 229. Plaintiff did not perform the work required to vest the remainder of his option, which depended on performance criteria that were never approved by defendant.

Plaintiff argues his option grant is a "wage" because defendant has a policy or practice of

awarding performance stock options. (See Resp. Opp. (DE 73) at 30). Even assuming plaintiff's argument is true, plaintiff must still show that he actually earned the his stock option for it to qualify as a "wage."[2] Plaintiff is unable to do so, because the parties never specified the "time, task, piece, job, day, commission, or other basis of calculation" required to vest the remainder of the option. (Erdman Dep. (DE 52-1) 73:21-25; Lamb Dep. (DE 68-9) 61:5-25; Clarke Dep. (DE 68-22) 48:1-6, 56:3-13, 100:3-18). Consequently, the court grants defendant's motion for summary judgment as to plaintiff's NCWHA claim.

C.      Defendant's <u>Daubert</u> Motion (DE 61)

Defendant seeks to exclude the testimony of plaintiff's expert Foley. Where the court has founds plaintiff's claims fail as a matter of law, the court denies the motion as moot.

D.      Plaintiff's Motion to Amend (DE 78)

Plaintiff seeks to amend his complaint in order to argue that defendant breached two contracts: his offer letter, and his option grant. The proposed amended complaint alleges plaintiff is entitled to exercise his option for all 15,000 shares of stock because the Committee granted him the stock option on April 25, 2013, but never approved any performance criteria for the option. Citing defendant's Plan and Foley's expert testimony, plaintiff argues that the committee breached a contract because he was fully vested in all his shares.

District courts should "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). But the United States Court of Appeals for the Fourth Circuit has explained that "after the deadlines provided by a scheduling order have passed, the good cause standard [of

---

[2] Plaintiff fails to assert that his bonus compensation does not constitute a "wage." The court construes this as a waiver regarding plaintiff's bonus compensation claim. In any event, plaintiff received a bonus each year and the amount of the bonus was left to the discretion of defendant. (See Erdman Dep. (DE 52-3) 154:13-19, 166:1-11, 169:16-18; Offer Letter (DE 68-4) at 1). Therefore, plaintiff cannot claim unpaid wages based on his bonus.

Rule 16(b)(4)] must be satisfied to justify leave to amend the pleadings." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008). The good cause standard focuses on the diligence of the party seeking the proposed amendment. McMillan v. Cumberland Cty Bd. of Ed., 734 F. App'x 836, 845–46 (4th Cir. 2018). If a moving party can show good cause to amend its pleading past the deadline in the scheduling order, a motion to amend will only be denied if amendment would be prejudicial to the other party, there has been bad faith by the moving party, or amendment would be futile. Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999) (citing Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986)).

In Nourison Rug, the district court rejected defendant's motion to amend his complaint where defendant first raised a new defense in opposition to motion for summary judgment, finding no good cause for the delay in raising the defense. 535 F.3d at 298. The Fourth Circuit upheld the district court's ruling, finding that counsel had failed to demonstrate good cause. Id.

In this case, motions for leave to join additional parties or to otherwise amend the pleadings were due from plaintiff by May 1, 2017. (Case Management Order (DE 14) at 6). Neither party sought leave to amend this deadline. After several extensions in this case, discovery concluded August 31, 2018, and dispositive motions were due September 30, 2018. Defendant filed its corrected motion for summary judgment on October 2, 2018. On November 20, 2018, plaintiff asserted for the first time in his response in opposition to the motion for summary judgment that defendant breached not only an employment agreement, but a binding stock option grant that had fully vested in plaintiff. (Resp. Opp. (DE 73) at 15-17). Plaintiff filed his motion to amend on January 15, 2019. (DE 78).

Plaintiff's expert report in this case was completed September 29, 2017. (See Foley Report

(DE 79-1)).  Therefore, plaintiff knew at approximately that time that he could allege breach of an option contract, and "conform the [c]omplaint to facts that evolved during the discovery process and that have been fully investigated by each party."  (Pl. Mem. (DE 79) at 5).  Instead, plaintiff waited until over 15 months later, and almost three weeks after submission of defendant's motion for summary judgment, to file his motion.

Plaintiff argues that his original complaint addresses breach of the stock option contract as well as breach of his employment contract, and therefore he is only offering the proposed amendment "out of an abundance of caution."  (Pl. Reply (DE 83) at 2).  The court disagrees. Plaintiff's proposed allegations rely on a completely different breach of contract theory than in the original complaint.  The original complaint alleges defendant breached its employment contract with plaintiff by failing to negotiate and approve performance criteria, thereby preventing him from vesting in the remainder of his stock option.  Plaintiff's proposed amended complaint switches horses, alleging instead that defendant had a valid stock option contract distinct from plaintiff's employment agreement, and that plaintiff was completely vested in his stock option all along because defendant's compensation committee did not set vesting restrictions.  Such new allegations are a distinct theory of liability not alleged in the original complaint.

"Given their heavy case loads, district courts require the effective case management tools provided by Rule 16."  Nourison Rug, 535 F.3d at 298.  Plaintiff has not shown that he was diligent in asserting his new breach of contract claim.  Where good cause does not support plaintiff's motion to amend, the court denies the motion.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (DE 49) is

GRANTED.  Defendant's motion to exclude expert testimony of Brian Foley (DE 61) is DENIED

AS MOOT.  Plaintiff's motion to amend (DE 78) is DENIED.  The clerk is DIRECTED to close this

case.

SO ORDERED, this the 5th day of April, 2019.


_____
LOUISE W. FLANAGAN
United States District Judge